Aram Ordubegian (SBN 185142)
M. Douglas Flahaut (SBN 245558)
Christopher K.S. Wong (SBN 308048)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:   213.629.7400
Facsimile:    213.629.7401
aram.ordubegian@arentfox.com
douglas.flahaut@arentfox.com
christopher.wong@arentfox.com

*Proposed* General Bankruptcy and Restructuring
Counsel for Debtors and Debtors-In-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re<br>**G-STAR RAW RETAIL INC.**, a Delaware corporation,<br>    Debtor and Debtor-in-Possession.<br>-------------------------------------------------------<br>In re<br>**G-STAR INC.**, a Delaware corporation,<br>    Debtor and Debtor-in-Possession.<br><br>[x] Affects both Debtors.<br>[ ] Affects G-Star Raw Retail Inc. only.<br>[ ] Affects G-Star Inc. only.<br><br>        Debtors and Debtors-in-Possession. | *Proposed* Lead Case:<br>Case No.: 2:20-bk-16040-WB<br>Chapter 11<br><br><br>Case No.: 2:20-bk-16041<br>Chapter 11<br>[Joint Administration Requested]<br><br><br>**DECLARATION OF NICOLE CLAYTON IN SUPPORT OF EMERGENCY "FIRST DAY" MOTIONS** |

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/22398533.5

I, Nicole Clayton, declare as follows:

1. I am over 18 years of age. If called as a witness, I could and would competently testify with respect to the matters set forth in this declaration from my own personal knowledge or from knowledge gathered from others within the debtors' organization and the debtors' advisors, my review of relevant documents, or my opinion based upon my experience concerning the debtors' operations.

## I.

## **THE DECLARANT**

2. In my capacity as General Manager, North America, I am the Chief Executive Officer of G-Star Inc. ("G-Star") and G-Star Raw Retail Inc. ("G-Star Retail"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases (each a "Debtor", and collectively, the "Debtors"). On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), electing to proceed under Subchapter V. I am familiar with the day-to-day operations, businesses, and financial affairs of the Debtors.

3. I submit this declaration (the "First Day Declaration") to provide the Court and other parties in interest with an overview of the Debtors' business and to describe the circumstances compelling the commencement of these chapter 11 cases. I also submit this First Day Declaration in support of the "first day" motions and applications filed by the Debtors contemporaneously herewith, by which the Debtors seek relief to continue as going concerns, operate effectively, maximize the value of the estates, and minimize certain potential adverse effects of the commencement of their chapter 11 cases, the continued effects on their businesses caused by the current Coronavirus Disease 2019 pandemic ("COVID-19"), and the current unrest throughout major cities in the United States.

## II.

## CORPORATE AND CAPITAL STRUCTURE

**A.    Debtors' Corporate Structure**

4.    Debtor G-Star is a wholly-owned U.S. subsidiary of G-Star Raw C.V. which is based in the Netherlands (the "Parent"). In turn, G-Star has two wholly-owned subsidiaries – G-Star Retail and G-Star Raw eStore Inc., as illustrated in the chart below. While G-Star Raw eStore Inc. is a wholly owned subsidiary of Debtor G-Star, it has not sought bankruptcy protection at this time.

```
                    G-Star Raw C.V.
                           |
                     G-Star Inc.
                     /          \
         G-Star Raw Retail Inc.   G-Star Raw eStore Inc.
```

**B.    The G-Star Brand**

5.    Founded in 1989, the philosophy of the G-Star Brand has always been, 'Just the Product.' This single-minded approach has led to many denim 'firsts': the introduction of 'luxury denim for the streets,' by fusing high-level craftsmanship with street level edge to create a new denim sector; the positioning of raw, untreated denim as a wearable and desirable material; and the evolution of its distinctive denim silhouette, through the adoption of architectural and 3-D thinking into denim construction.

6.    Since launching in the United States, G-Star (through itself and its subsidiaries) has been the exclusive distributor of G-Star products in the U.S. market. The U.S. entities including the Debtors have been granted the exclusive right to distribute G-Star branded products in the U.S. through a detailed distribution and licensing agreement with the Parent, whereby G-Star purchases its merchandise from the Parent for resale through wholesale channels and, via its subsidiaries G-Star Retail and non-debtor G-Star Raw eStore Inc. In this manner, the Debtors have carried the G-Star brand and its core philosophy into the U.S. market.

7.   The Debtors advertise, market, and distribute G-Star products and other merchandise through retail and wholesale channels throughout the United States. As is customary for a company of its size and scale, the Debtors maintain a business relationship and enter into transactions with the Parent in the ordinary course of business. Specifically, all of the Debtors' merchandise are G-Star products, which the Debtors purchase in the ordinary course of business from the Parent for resale in the United States. The Debtors' domestic supply chain, logistics, and warehousing are primarily handled by Port Logistic Group and UPS, who deliver the products between and among the warehouse, the Debtors' retail locations, and the Debtors' third-party wholesale partners.

**C.    G-Star Retail**

8.   G-Star Retail generally encompasses the brick and mortar retail operations in the United States with a flagship store operating on Rodeo Drive in Beverly Hills. Prior to the COVID-19 global pandemic, G-Star Retail operated approximately 31 stores across 12 states. Unfortunately, on account of the global pandemic, G-Star Retail was forced to shutter its stores and lay off all of its retail employees and a majority of its corporate employees. Additionally a number of its stores was also adversely affected by the recent civil unrest and a significant amount of inventory in the affected stores was looted.

9.   Currently G-Star Retail is in the process of reopening certain retail stores where it is financially and physically possible to do so. However, that has proved an arduous process and, as set forth more fully below, the current intention is to reduce the retail footprint to around 7 stores, though this number could change slightly in the event certain landlords are willing to make significant concessions. While the Debtors have been concerned with the profitability of many of G-Star Retail's brick and mortar retail locations for some time, the onset of the COVID-19 global pandemic has accelerated the need for a 'right-sizing' of G-Star Retail, and it has no choice but to close its unprofitable locations and reject the associated leases immediately as part of these restructuring proceedings.

**D.  G-Star Inc.**

10.  G-Star is the main United States member of the international G-Star brand family of companies.  G-Star sells and distributes merchandise directly through its wholesale operations and indirectly through its wholly-owned subsidiaries.

11.  On the wholesale side, G-Star has valuable relationships nationwide with retailers such as department stores, specialty retailers and boutiques, and other retailers through which their products are sold including Macy's, Bloomingdale's, Nordstrom Rack, Saks Fifth Avenue, Neiman Marcus, etc.  In 2019, the Debtors' wholesale operations generated net sales of approximately $30 million, comprising approximately 43% of their 2019 net sales.

12.  G-Star also supports G-Star Raw eStore, the non-filing subsidiary which provides the U.S. e-commerce channel.  G-Star Raw eStore sells G-Star products on the internet through the website: https://www.g-star.com/en_us.

**E.  Debtors' Prepetition Debt Structure**

13.  The Debtors have no secured debt.  Instead of traditional bank financing, the Debtors' cash flow needs have historically been managed through a revolving credit account with the Parent.  Due to substantial build-out costs, the losses incurred by the retail operations, and other ongoing operational losses, this account has grown significantly.  As of Petition Date, G-Star owes the Parent approximately $16.3 million.  Additionally, G-Star Retail owes the Parent approximately $1.2 million and owes G-Star approximately $9.7 million.  As such, the Parent is expected to be the largest non-debtor creditor of both Debtors, excluding the intercompany debt owed by G-Star Retail to G-Star.

14.  The Debtors have been paying all of their trade vendors in the ordinary course of business and believe they are substantially current with respect to their trade obligations other than certain landlord obligations which they have not been able to pay.  The Debtors estimate the claims of the landlords both directly and on guarantees will make up the majority of the non-insider claims in these cases.

15.  As of the Petition Date, the Debtors' capital structure on a consolidated basis consists of approximately $17.5 million due to the Parent, approximately $5.7 million due for

unsecured trade debt and past-due rent, and approximately $0.8 million for other potential unsecured debt, exclusive of potential lease rejection claims.

### III.

### EVENTS LEADINGS TO CHAPTER 11 FILINGS

16. In late February and early March of 2020, the Debtors began experiencing the adverse effects of the COVID-19 pandemic. This has severely disrupted the Debtors' business operations, and the global fallout from the pandemic is ongoing. In an effort to fight the public health crisis caused by the COVID-19 outbreak and to comply with the mandates imposed by governmental authorities in the states where the Debtors operate, all retail stores were closed in March 2020.

17. At first, the employees were furloughed, but when it became apparent that the government mandated closures would last longer than a few weeks and the prospect of customers was going to extend far longer, the Debtors took steps to manage the cash drain and laid off substantially all of the retail employees.

18. Adding to the lack of store and wholesale sales, many of our stores were subjected to looting during a period of civil unrest in late May and early June. Looters stole inventory and damaged fixtures, entryways and premises to the point where we would need to commit significant capital commitment to bring them back into operating shape.

19. Lastly, the Debtors began to face unprecedented liquidity and operational challenges due to being forced to close their retail stores to comply with COVID-19 related governmental health guidelines and directives.

20. Over the past few months, the Debtors began to evaluate their lease portfolios and communicate with landlords to negotiate for improved lease terms. However, those talks have not been sufficiently productive, and without landlord cooperation and without adequate rent abatement and reduction, there are few practical alternatives for the Debtors. Accordingly, the Debtors did not see a viable path to obtaining the rent concessions that are needed to strengthen their financial position sufficiently to weather the continuing COVID-19 pandemic outside of a formal restructuring.

21. Based on my experience, and in consultation with the Debtors' advisors, I have concluded that it is necessary for the Debtors to pursue a "right sizing" strategy that will entail reevaluation of wholesale partners, critical adjustments of the lease portfolios, and reorganization around profitable stores.

## IV.

## GOAL OF THE BANKRUPTCY

22. The Debtors commenced these chapter 11 cases to preserve value for their stakeholders, including their employees and creditors, with the hope of restarting operations and reopening the previously-profitable stores once the COVID-19 crisis has passed, thus preserving future enterprise value as much as possible.

23. The Debtors look forward to working closely with the Subchapter V trustee and the creditors to propose a joint plan as soon as possible that will harness the value of the Debtors newly right-sized operations over three to five years as required under the Bankruptcy Code.

## V.

## FIRST DAY MOTIONS

24. Concurrent with the filing of this First Day Declaration, the Debtors filed a number of first day motions seeking relief which the Debtors believe is necessary to avoid irreparable harm in the early days of these cases, enable them to efficiently administer their estates and continue to operate with minimal disruption and loss of value during these chapter 11 cases, and to ensure the best outcome for the Debtors, their estates, and their creditors (collectively, the "First Day Motions").

25. I have reviewed each of the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge, information and belief with appropriate reliance on corporate officers and advisors. I believe the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm and to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. The Debtors request that the relief sought in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.

Case 2:20-bk-16040-WB    Doc 10    Filed 07/03/20    Entered 07/03/20 16:52:07    Desc
                          Main Document         Page 8 of 18

26. The First Day Motions are comprised of the following seven (7) pleadings:

(a) *Motion for Order Directing Joint Administration of Related Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) and Local Bankruptcy Rule 1015-1* (the "Joint Administration Motion");

(b) *Emergency Motion for Order Authorizing Debtors and Debtors-in-Possession to Honor Certain Prepetition Employee Benefits and Wages in the Ordinary Course of Business* (the "Wage and Benefits Motion");

(c) *Emergency Motion for an Order Authorizing Debtor and Debtor-In-Possession to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Customer Programs and Practices* (the "Customer Programs Motion").

(d) *Emergency Motion for Order (1) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and (2) Determining Adequate Assurance of Payment for Future Utility Services* (the "Utilities Motion");

(e) *Emergency Motion for Order (I) Authorizing the Debtor and Debtor-in-Possession to Pay Prepetition Sales Taxes in the Ordinary Course of Business and (II) Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* (the "Taxes Motion");

(f) *Emergency Motion for Order Authorizing Maintenance of Existing Bank Accounts* (the "Cash Management Motion"); and

(g) *Emergency Motion for Order Extending Time to Complete Schedules of Assets and Liabilities and Statement of Financial Affairs and Related Materials* (the "Motion to Extend Time to File Schedules").

**A.    The Joint Administration Motion**

27. Given the integrated nature of the Debtors' operations, I believe joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Based on my conversations with Debtors' counsel, I also anticipate the Debtors will be filing a joint plan of reorganizing in these cases and believe that having the cases administered jointly will streamline that process.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

AFDOCS/22398533.5

**B.    The Wage and Benefits Motion**

28.    I submit, on behalf of the Debtors, that the Wage and Benefits Motion should be granted as the relief sought therein will allow the Debtors to retain their employees, preserve value, and operate their business in these chapter 11 cases. More specifically, the necessary relief as it relates to each Debtor is set forth below:

***G-Star***

29.    G-Star has approximately 15 full-time employees, each of whom is critical to the Debtors' reorganization efforts. These employees have essential knowledge relating to the Debtors' business processes and systems, the employees provide important administrative functions, human-resource services, marketing, and wholesale and distribution services needed to ensure the continued viability of the Debtors. Now that the bankruptcy cases have been filed, many of G-Star's employees will also be involved in preparing vital financial projections and budgets, and assisting with the formulation of a plan of reorganization.

30.    G-Star's employees are paid their wage and salaries on the 15th (for work performed from the 1st through the 15th of the same month) and 30th of each month (for work performed from the 16th to the 30th of the same month).

31.    I believe that the failure to honor payroll commitments and discontinuing employee programs will be devastating to employee morale and will almost certainly result in significant employee attrition. This is especially true for a debtor in the midst of a reorganization effort. Many employees are already going to be concerned about their job security, and it is therefore imperative assurance is provided that, so long as employees remain with the company, they can be assured that G-Star will continue to honor all of its employee obligations in the ordinary course of business without disruption.

32.    At any given time, G-Star has outstanding payroll obligations to its employees. G-Star's most recent regular payroll covered all amounts due to corporate employees through the cut-off date of June 30, 2020. Based on G-Star's historical payroll expenses and outstanding payroll obligations, prepetition payroll obligations to full-time employees are estimated to total

approximately $25,000. None of G-Star's employees are expected to be owed more than $13,650.00 on account of accrued, unpaid prepetition wages.

33. G-Star routinely withholds from the employee wages certain amounts that it is required to transmit to third parties for purposes such as federal and state or local income taxes. For the tax period June 1, 2020 to June 30, 2020, G-Star should have paid all arrears in full on June 30, 2020 in the amount of $30,011, thus I believe G-Star is current on its withholding obligations.

### *G-Star Retail*

34. G-Star Retail has approximately 20 full-time and part-time employees,[1] each of whom I believe is critical to the Debtors' reorganization efforts. These employees have essential knowledge relating to the Debtors' business processes and systems. While most of these employees provide primarily retail services, others perform important administrative functions, human-resource services, marketing, and distribution services needed to ensure the continued viability of the Debtors.

35. G-Star Retail employees are paid on the 10th of the month (for work from the 16th through the end of the month prior) and 25th of each month (for work from the 1st through the 15th of the same month). To minimize disruptions to regular payroll schedules, it is imperative the Wage and Benefits Motion gets heard on or before Thursday, July 9, 2020.

36. Based on historical payroll expenses and outstanding payroll obligations, prepetition payroll obligations to full-time and part-time employees of G-Star Retail are estimated to total approximately $30,000. None of G-Star Retail's employees are expected to be owed more than $13,650.00 on account of accrued, unpaid prepetition wages.

37. I believe that the failure to honor payroll commitments and discontinuing employee programs will be devastating to employee morale and will almost certainly result in significant employee attrition. This is especially true for a debtor in the midst of a reorganization effort. Many employees are already going to be concerned about their job security, and it is therefore imperative assurances is provided that so long as employees remain with the company, they can be assured

---

[1] As its stores reopen, G-Star Retail expects it will be hiring additional employees.

that G-Star Retail will continue to honor all of its employee obligations in the ordinary course of business without disruption.

38. G-Star Retail routinely withholds from the employee wages certain amounts that it is required to transmit to third parties for purposes such as federal and state or local income taxes. For the tax period June 1, 2020 to June 15, 2020, the Debtors paid all arrears in full on June 30, 2020 in the amount of $1,731. G-Star Retail is therefore current on its withholding obligations.

### Both Debtors

39. The Wage and Benefits Motion also requests that the Court enter an order authorizing the Debtors to honor and continue their employee benefits in the ordinary course of business. This relief applies solely to persons employed full-time by the Debtors from and after the Petition Date. A summary of the employee benefits that the Debtors intend to honor notwithstanding the filing is set forth below:

(a) *Paid Time Off ("PTO")*. PTO for full-time employees for G-Star and G-Star Retail begins accruing on the date of hire. The Debtors pay their employees for unused PTO upon the employee's termination. Because PTO restarted at the beginning of the calendar year, the Debtors' employees have only accrued limited PTO. G-Star's books and records indicate that, as of the Petition Date, its outstanding liability for all accrued PTO was approximately $55,000, representing 800 hours of PTO. G-Star Retail's books and records do not show a meaningful amount of accrued PTO, because substantially all of G-Star Retail's employees were laid-off due to the COVID-19 pandemic, and all current G-Star Retail employees were only recently hired.

(b) *Reimbursable Expenses.* The Debtors reimburse employees for reasonable, approved expenses incurred in connection with the performance of their duties. Reimbursable expenses include travel-related expenses such as meal allowances, air and ground transportation, lodging, car mileage allowances, and other business-related expenses. Employees who pay for their own reimbursable expenses up front apply for reimbursement of expenses. As of the Petition Date, G-Star estimates it owes approximately $20,000 and G-Star Retail estimates it owes $5,000 in reimbursable expenses.

(c) *Medical Insurance*. The Debtors' business practice is to provide their full-time employees the choice to elect AETNA/Total Benefits Solutions as their insurance plan. The Debtors contribute 75% to each employee's insurance plan through payroll reduction. Participating employees' contributions to the medical plans are deducted from such employees' bi-weekly pay. To administer their plan, the Debtors typically pay a monthly fee at the beginning of each month for the coming month. As of the Petition Date, the Debtors estimate they owe approximately $125,000, though a portion of this amount is prepayment for the postpetition period of July 3 through July 31, 2020.

(d) *Dental Insurance.* The Debtors offer eligible employees the option to participate in dental insurance plans (the "Dental Plans") which are administered by Lincoln. As of the Petition Date, G-Star estimate it is responsible for remitting approximately

- 11 -

    $10,000 related to the Dental Plans. G-Star Retail's books and records show it is current as related to the Dental Plans.

  (e) **Retirement Plans.** The Debtors maintain a retirement savings plan through Ascensus for the benefit of all eligible employees that satisfy the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). On account of employer 401(k) matching contributions to the 401(k) Plan, G-Star estimates it owes $7,500 and G-Star Retail estimates it owes $2,500 as of the Petition Date.

  (f) **Workers Compensation and Other Insurance Programs.** The Debtors also maintain insurance policies workers compensation and employers liability, and life insurance, accidental death and dismemberment insurance, and short-term and long-term disability benefits, as administered by Unum. As of the Petition Date, G-Star estimates it owes approximately $1,500. G-Star Retail's books and records indicate it has no prepetition premiums outstanding.

  (g) *Flexible Spending Accounts*. Eligible employees may enroll flexible spending accounts ("FSA Accounts") administered by Medcom. As of the Petition Date, G-Star and G-Star Retail estimate they are responsible for remitting approximately $5,000 and $1,500, respectively, related to the FSA Accounts.

40. The Wage and Benefits Motion also requests that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and to honor all transfer requests made by the Debtors related to employee obligations discussed herein, whether such checks were presented or funds transfer requests were submitted prior to or after the Petition Date (including checks that have been presented and dishonored), to the extent that the accounts contain sufficient funds.

41. The Debtors will identify to the banks the checks that are to be honored pursuant to an order approving the Wage and Benefits Motion. Accordingly, checks other than those for employee obligations should not be honored inadvertently.

42. I therefore submit, on behalf of the Debtors, that the Wage and Benefits Motion should be granted as the relief sought therein will allow the Debtors to retain their employees, preserve value, and operate their business in these chapter 11 cases.

**C.** **The Customer Programs Motion**

43. G-Star Retail offers standard customer programs that I believe are essential for the Debtors to remain competitive and maintain their customer base. The Customer Program Motion seeks authority for G-Star Retail, in their discretion, to continue to honor the return / exchange program and to honor unredeemed gift cards in the ordinary course of their business in order to maintain customer confidence during their reorganization effort. Absent such relief, I believe that

customer relations will be severely and irreparably harmed at a time when customer loyalty and patronage is critical to the Debtors. G-Star Retail's customer programs (the "Customer Programs") include:

(a) ***Exchanges & Returns***. If a customer is not happy with a purchase, he or she can return the item to any G-Star stores or to the location stated on the item's return label, according to the following guidelines:
  i. G-Star Retail will accept returns or exchanges of all merchandise that is unworn, unwashed and that still has the original label and in their packaging, if such merchandise is purchased no more than 14 days prior to the return or exchange;
  ii. G-Star Retail retains the right to send items back to the customer in case the item looks washed, worn or shows signs of damage that is clearly not a production flaw; and
  iii. Refunds will be made within 14 days of return and will only be credited to the original purchase credit card or bank account.
  iv. For unworn merchandise returned without a receipt, G-Star Retail will offer and exchange for store credit at the lowest selling price within the last 14 days.

(b) ***Store Credit:*** G-Star Retail issues store credit to customers who return merchandise without a receipt or returns merchandise originally purchased as a gift. Also, G-Star Retail may in its discretion issue store credit where the customer makes a return that falls outside of the above-described policies. Store credits are issued in the form of receipt papers and cannot be redeemed for cash. G-Star Retail's books and records indicate that there are approximately 3,000 to 4,000 of outstanding store credits totaling $130,000 as of Petition Date. None of the store credits are in amounts that equal or exceed $3,025.

(c) ***Gift Cards:*** Before Spring of 2019, G-Star Retail sold gift cards which are valid towards future purchases of merchandise from store locations and through the Debtors' online website. Gift cards cannot be redeemed for cash, except for gift cards with *de minimus* remaining value as required by law in certain states. As of Spring of 2019, G-Star Retail decided to eliminate the sale of gift cards, but G-Star Retail is honoring unredeemed gift cards, which according to its books and records, total approximately 400 to 700 with a total outstanding obligation of approximately $23,000 as of the Petition Date. None of the unredeemed gift cards are in amounts that equal or exceed $3,025.

44. On behalf of G-Star Retail, I submit that the Court should approve the Customer Programs Motion in the interest of maintaining the confidence of their customers and engendering of goodwill, which are critical to the Debtors' reorganization efforts in these cases.

**D.    The Utilities Motion**

45. For the Debtors' operation of their business, the Debtors incur expenses for electricity and natural gas, and/or other services from certain utility companies. The complete list of utility providers (the "Utility Companies"), identifying the account, type of utility service received, average monthly expenses, and proposed adequate assurance deposits is attached as **Exhibit 1** to the Utility Motion.

46. I believe any interruption, no matter how brief, would disrupt the Debtors' ability to operate their business and serve their customer base. The impact of this disruption on the Debtors' business and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts.

47. I believe the Utility Deposits and the Adequate Assurance Procedures, as those terms are defined and described in the Utility Motion, constitute sufficient adequate assurance to the Utility Companies and are necessary for the Debtors to effectuate their chapter 11 strategy without costly disruptions which would result from discontinued utility services. Without the Utility Deposits and the Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by the Utility Companies in a disorganized manner at a critical juncture in these chapter 11 cases and during a time when the Debtors' efforts could be more productively focused on the continuation of the Debtors' operations for the benefit of all parties in interest.

48. I understand that the Utility Companies could unilaterally decide that they are not adequately protected, and therefore, may make unreasonable demands for payment to continue providing service or discontinue providing service to the Debtors altogether. Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.

49. I submit, on behalf of the Debtors, that the Utility Motion should be granted to avoid the discontinuation of utility services and allow the Debtors to continue operating post-petition.

**E.     The Taxes Motion**

50. In the ordinary course of business, G-Star Retail accrues sales taxes on retail goods that it has sold. While the payment of sales tax is generally current it is typically paid monthly and, in the aggregate, G-Star Retail estimates that approximately $40,000 in sales taxes will be owed as of the Petition Date as set forth in **Exhibit 1** to the Taxes Motion.

51. G-Star Retail should be permitted to pay its sales taxes to avoid potential costly distractions during these chapter 11 cases and to limit disruptions to its operations moving forward. It is my understanding that the company's failure to pay the Taxes could adversely affect its business operations by imposing significant penalties and interest against the estate.

52. Accordingly, on behalf of G-Star Retail, I submit that the Taxes Motion should be approved to enable G-Star Retail to continue operating as debtor-in-possession without disruption.

**F.** **Cash Management Motion**

53. It is essential that the Debtors be permitted to modify the typical banking requirements of a debtor-in-possession so that they can maintain their existing bank accounts and cash management system as described in the Cash Management Motion, and that the Court grants the relief requested therein on an emergency basis. The relief requested in the motion is essential to maintaining smooth operations and to preventing an interruption in either the Debtors' receipt of revenues or its prompt payment of payroll and other obligations that are essential to the maintenance of going-concern operations. If the Debtors are required at this time to close all of their prepetition bank accounts and reconstruct their cash management system from scratch, this would constitute a major administrative burden, and the Debtors' payroll and revenue collection activities would suffer a serious interruption, which could cause immediate and irreparable harm to the Debtors' business operations, interrupt the timely collection of funds upon which its operations depend, and significantly jeopardize their reorganization efforts.

54. As illustrated by the chart below, the Debtors currently maintain four bank accounts (the "Accounts"):

| Account Holder | Bank | Account Number (Last Four Digits) | Incoming Flows | Outgoing Flows |
|---|---|---|---|---|
| G-Star | Bank of America | 8253 | Wholesale customers (checks and credit cards) | Bank and account fees (direct debits) |
| G-Star Retail | Bank of America | 4015 | Point of sale revenues, cash drops, Safe Connect | Chargebacks, point of sale fees, (direct debits) |
| G-Star | Deutsche Bank USA | 8493 | Wholesale customers (wires) | Wires and checks |
| G-Star Retail | Deutsche Bank USA | 8362 | N/A | Wires and checks |

55. Use of the existing bank accounts and the Debtors' cash management system, with modification as described below, ensures the Debtors are able to accurately record collections, transfers, and disbursements as they are made through the various Accounts. Prior to the Petition Date, the cash management system has four (4) main components:

- 15 -

   i. cash collection at the store level, whereby the cash and checks from sales at the Debtors' retail stores are deposited into the Bank of America account held by G-Star Retail – Account No. 4015 (the "Store Account");

   ii. collections from wholesale customers into the Bank of America account held by G-Star – Account No. 8253 and the Deutsch Bank USA account held by G-Star – Account No. 8493 (the "Wholesale Accounts");

   iii. the sweeping of all funds from the Store Account, and the Wholesale Account, on a daily basis, into a consolidated store account held by the Parent (the "Master Account");[2]

   iv. the Deutsch Bank USA accounts held by G-Star Retail – Account No. 8362 and G-Star – Account No. 8493 are disbursement accounts (the "Disbursement Accounts") and payroll accounts (the "Payroll Accounts") from which funds are drawn from the Master Account for check disbursements, wires, or other methods to satisfy payments in the ordinary course of business to third parties and payroll obligations.

56. The Debtors are in the process of opening new debtor-in-possession accounts (General, Payroll, and Tax accounts) at Bank of America. Then, if permitted to keep the prepetition accounts open as requested, the Debtors will put in place a system to regularly sweep the funds in the Accounts into the DIP accounts held at Bank of America. In this manner the Debtors will be able to continue to accept payments into the Accounts but will ensure no significant amount of funds are held for any time at a non-DIP account.

57. Maintaining the Debtors' bank accounts and cash management system will not interfere with performance of their duties as debtors-in-possession, including their obligations to segregate and separately account for prepetition and postpetition financial activities. Only prepetition checks related to prepetition obligations authorized by this Court will be honored by the Debtors (*i.e.*, wages). No other prepetition checks will be cleared through these accounts. Moreover, in accordance with the U.S. Trustee Guidelines, the Debtors are in the process of closing

---

[2] The sweeping of funds to the Master Account will stop immediately upon the filing of these cases.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/22398533.5

their books and records and opening "new" books and records for the postpetition period. These measures are reasonable and sufficient to ensure that the Debtors separately account for their postpetition financial activities as required.

58.     In the ordinary course of business, the Debtors incur periodic bank charges and fees in connection with (a) bank services, (b) check processing and deposits, including fees associated with any overdrafts, and (c) transferring funds by wire or other electronic means (the "Bank Fees"). It is difficult for the Debtors to determine the precise amount of prepetition Bank Fees because of the fluidity of bank account activity, but the Debtors owe approximately $6,000 in Bank Fees as of the Petition date, and I believe it is necessary to pay these fees in order to maintain the current cash management system.

59.     I therefore submit, that the Debtors be authorized to maintain their Accounts as they were maintained prepetition, without interruption, and in the ordinary course of business. The Debtors also request the authority to implement changes to the cash management system, including, opening new or closing existing bank accounts owned by the Debtors, including the DIP Accounts.

**G.     The Motion to Extend Time to File Schedules**

60.     The Debtors also filed a Motion to Extend Time to File Schedules, requesting that the Court extend the time to file the Schedules and Statement of Financial Affairs (collectively, the "Schedules") for fourteen (14) days.

61.     Given the size and complexity of the Debtors' business and financial affairs, and urgent matters requiring and focus and attention of the Debtors' key personnel and advisors prior to the commencement of these chapter 11 cases, I believe that it would be very difficult, if not impossible, to prepare the Schedules with the appropriate attention and detail by the statutory 14-day deadline. At this juncture, preparation of the Schedules would distract from the critical efforts to reopen stores that have been closed by the COVID-19 pandemic and otherwise interfere with the major operational compliance issues arising from the transitioning the Debtors to a Chapter 11 debtors-in-possession and attending to various matters required by the U.S. Trustee, including closing the Debtors' books and preparing the 7-day package.

62. I therefore believe that a short 14-day extension by this Court for the Debtors to file their Schedules should be granted on an emergency basis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed Friday, July 3, 2020, at New York, New York.

*Nicole Clayton*

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -